## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

WILD MEADOWS HOMEOWNERS   :
ASSOCIATION, INC., and FRED NEIL, :   C.A. No. K19A-02-001 NEP
                        :   In and for Kent County
         Appellants,    :
                        :
     v.                :
                        :
WILD MEADOWS MHC, LLC,    :
                        :
         Appellee.     :

Submitted:  March 17, 2020
Decided:  April 28, 2020

Upon Appeal from the Decision of the Arbitrator

**AFFIRMED**

## MEMORANDUM OPINION AND ORDER

Olga K. Beskrone, Esquire, Community Legal Aid Society, Inc., 100 W. 10th Street, Suite 801, Wilmington, DE  19801, Attorney for Appellant Wild Meadows Homeowners Association, Inc.

Michael P. Morton, Esquire and Robert J. Valihura, Jr., Esquire, Morton, Valihura & Zerbato, LLC, 3704 Kenneth Pike, Suite 200, Greenville, DE  19807, Attorneys for Appellee.

**PRIMOS, J.**

1

Before the Court is the appeal of the Wild Meadows Homeowners Association, Inc. (hereinafter the "HOA"),[1] from the decision of the arbitrator, Robert G. Gibbs, Esquire (hereinafter the "Arbitrator"), holding that Appellee Wild Meadows MHC, LLC (hereinafter "Wild Meadows"), is permitted to increase the lot rent in the Wild Meadows manufactured home community (hereinafter the "Community") above the average annual increase of the Consumer Price Index, or "CPI-U,"[2] pursuant to the Affordable Manufactured Housing Act, also known as the Rent Justification Act (hereinafter the "Act").[3] Upon review of the record, this Court has determined that the Arbitrator's decision was supported by substantial evidence and that the Arbitrator made no errors of law in reaching his conclusions. Therefore, the Arbitrator's decision is **AFFIRMED**.

## I.    FACTUAL BACKGROUND

The Community is located in Dover, Delaware, and consists of 223 lots, all of which are occupied by manufactured homes. Each resident in the Community owns his or her home and rents the lot upon which the home is located from Wild Meadows, the community owner in this case.

---

[1] The Notice of Appeal was filed jointly on February 8, 2019, by counsel for the HOA and counsel for Fred Neil, an individual homeowner in the manufactured home community that is the subject of this appeal. However, after jointly filing a Motion for Stay of Proceedings along with counsel for the HOA on March 5, 2019, counsel for Mr. Neil did not participate further in these proceedings, and specifically did not himself file any briefs or sign on to the HOA's briefs. In addition, counsel for the HOA has not entered an appearance on behalf of Mr. Neil. Therefore, the Court can only conclude that Mr. Neil has effectively withdrawn his appeal. The Court further notes that Mr. Neil's effective withdrawal has in no way influenced its decision on this appeal.

[2] The CPI-U is "the average annual increase of the Consumer Price Index for All Urban Consumers in the Philadelphia-Wilmington-Atlantic City area." Former 25 *Del. C.* § 7042(a). Pursuant to the rent justification procedures of the Affordable Manufactured Housing Act, the CPI-U "for the most recently available 36-month period" is used. *Id.*

[3] Effective December 19, 2019, the provisions of the Act, including those regarding "Rent justification," Section 7042, and "Rent increase dispute resolution," Section 7043, were redesignated (*i.e.*, renumbered) and amended. This Opinion will cite the former statutes as they existed prior to the amendments. *See* Delaware 2019 Session Laws, Chapter 38, H.B. No. 45 Sec. 42, 43.

On October 27, 2017, Wild Meadows purchased the Community. At the time of the purchase, homeowners in Wild Meadows were paying a lot rent of $502.00 per month. Soon after the purchase, Wild Meadows spent $19,042.33 to purchase new furniture and computers for the Community's clubhouse. In a letter to the Community dated October 31, 2017, Wild Meadows notified the homeowners that it would be raising the lot rent above the CPI-U to $545.00. Wild Meadows held a meeting on November 20, 2017, with the homeowners of the Community to discuss the rent increase (hereinafter the "Final Meeting").[4] Subsequently, the HOA filed for arbitration to dispute the rent increase.

## II. PROCEDURAL HISTORY

The arbitration hearings on this matter were held on March 15, 2018, and May 17, 2018. The Arbitrator issued a written decision on January 21, 2019, concluding that Wild Meadows had properly justified the proposed rent increase pursuant to the Act. On February 8, 2019, the HOA filed a notice of appeal in this Court challenging the Arbitrator's decision.

On March 6, 2019, the Court stayed the matter until the Supreme Court issued its decision in *Sandhill Acres MHC, LC v. Sandhill Acres Home Owners Association*, 210 A.3d 725 (Del. 2019) (hereinafter "*Sandhill Acres*"). Following the Supreme Court's decision, briefing resumed, and the Court heard oral argument on February 7, 2020. Thereafter, the parties filed certain supplemental submissions, and the matter was submitted for decision on March 17, 2020.

---

[4] This meeting is required under the Act. *See* former 25 *Del. C.* § 7043(b) ("If the proposed rent increase exceeds the CPI-U, the Authority shall schedule a final meeting between the parties at a mutually-convenient time and place to be held within 30 days from the mailing of the notice of the rent increase, to discuss the reasons for the increase.").

## III.   STANDARD OF REVIEW

On appeal from an arbitrator's decision, this Court utilizes a substantial evidence standard of review.[5]   Therefore, this Court will affirm an arbitrator's decision that is supported by substantial evidence and is free from legal error.[6] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7]   Substantial evidence review affords "considerable deference" to an arbitrator.[8]  Finally, questions of law are reviewed *de novo*.[9]

## IV.   DISCUSSION

Pursuant to the Act, if a manufactured home community owner raises lot rent in accordance with the CPI-U, the homeowners within the community are not guaranteed a right to object to the rent increase.[10]  However, if the community owner intends to raise lot rent above the CPI-U, it must satisfy three requirements to survive a challenge to the proposed rent increase.[11]

First, the community owner must demonstrate that it did not violate any health or safety standards in the previous twelve months,[12] a factor that is not disputed here. Second, the community owner must demonstrate that "the proposed rent increase is directly related to operating, maintaining, or improving the manufactured home

---

[5] *Sandhill Acres*, 210 A.3d at 731 n. 37.

[6] Former 25 *Del. C.* § 7044.

[7] *Optima Cleaning Sys. v. Unemployment Ins. Appeal Bd.*, 2010 WL 5307981, at *2 (Del. Super. Dec. 7, 2010) (citing *Histed v. E.I. DuPont de Nemours & Co.*, 621 A.2d 340, 342 (Del. 1993) (internal quotations omitted)).

[8] *December Corp. v. Wild Meadows Home Owners Association*, 2017 WL 923459, at *1 (Del. Super. Mar. 7, 2017) (hereinafter "*December Corp. II*").

[9] *Person-Gaines v. Pepco Holdings,* 981 A.2d 1159, 1161 (Del. 2009).

[10] *Bon Ayre Land, LLC v. Bon Ayre Cmty. Ass'n*, 149 A.3d 227, 230 (Del. 2016) (hereinafter "*Bon Ayre II*")..

[11] *Id.*

[12] Former 25 *Del. C.* § 7042(a)(1).

community."[13]   Third, the community owner must show that at least one of eight possible additional factors applies; here, the factor at issue is "market rent," *i.e.*, that the rent increase sought is consistent with market rents in comparable manufactured home communities.[14]   Market rent is "that rent which would result from market forces absent an unequal bargaining position between the community owner and the home owners."[15]

**A. The Arbitrator's determination that the rent increase was directly related to operating, maintaining, or improving the Community pursuant to former 25 *Del. C.* § 7042(a)(2) is supported by substantial evidence and free from legal error.**

### 1. To make out a *prima facie* case, Wild Meadows was required only to produce evidence that it had incurred an expenditure that was likely to reduce its expected return.

In a series of decisions beginning with *Bon Ayre II* in 2016, and continuing with *Donovan Smith HOA v. Donovan Smith MHP, LLC*[16] in 2018 and *Sandhill Acres* in 2019, the Delaware Supreme Court has clarified the provisions of the Act regarding rent justification, including the Act's requirement that a community owner show a direct relation between the proposed rent increase and the operation, maintenance, or improvement of the community.   When he issued his decision in January 2019, the Arbitrator had the benefit only of *Bon Ayre II* and *Donovan Smith*, not of *Sandhill Acres*, but based upon the two earlier decisions, he found that the proposed increase was directly related to operating, maintaining, or improving the Community.

In *Bon Ayre II*, the Supreme Court explained that a community owner satisfies the "directly related" requirement of the statute by showing that, due to an

---

[13] *Id.* § 7042(a)(2).
[14] *Id.* § 7042(c)(7).
[15] *Id.*
[16] 190 A.3d 997, 2018 WL 3360585 (Del. July 10, 2018) (TABLE).

expenditure associated with "operating, maintaining, or improving the . . . community,"[17] the community owner's "original expected return has declined, because the cost side of its ledger has grown" – a "modest" requirement pursuant to which the community owner need only produce evidence "suggesting" that the return on its property has declined.[18] In *Donovan Smith*, the Supreme Court held that, by presenting evidence of certain costs associated with operating, maintaining, or improving the community – in that case, adding driveways and repainting a building – the community owner had created a presumption, upon which the arbitrator was entitled to rely, that the community owner's expected return had declined because its costs had grown.[19] The *Donovan Smith* Court left open the possibility that the homeowners could challenge that presumption at arbitration by requesting access to the community owner's books and records (*i.e.,* to test the community owner's assertion that its expected return had declined) or by arguing that the community owner was required to show such a decline from those books and records, but the Court determined that because the homeowners had failed to do either, the arbitrator's decision was entitled to affirmance.

In this case, by showing that it expended over $19,000 to purchase new furniture and computers for the Community's clubhouse, Wild Meadows presented presumptive evidence that its costs had increased in a manner that had caused its expected return to decline. Furthermore, the HOA, like the homeowners in *Donovan Smith*, failed at arbitration either to request access to relevant books and records or to argue that Wild Meadows was required to demonstrate a decline in its expected return from those documents. Nonetheless, the HOA has argued that, because Wild Meadows did not present evidence at arbitration of the prior community owner's

---

[17] Former 25 *Del. C.* § 7042(a)(2).

[18] *Bon Ayre II*, 149 A.3d at 235.

[19] 2018 WL 3360585, at *3.

costs for maintaining the Community, Wild Meadows failed to show that the **overall** costs for the Community had increased and thus failed to show that the **overall** return for the Community had declined. This argument flies in the face of the Supreme Court decisions noted *supra.*

Pursuant to *Bon Ayre II*, Wild Meadows satisfied its "modest" burden of presenting evidence of costs incurred – evidence that, unrebutted, would suggest that the return on its property had declined. Moreover, as in *Donovan Smith*, the Arbitrator had a basis for concluding, based upon the evidence presented, that the cost side of Wild Meadows's ledger had grown as a result of its expenditures for the clubhouse, and thus that its return had declined. The HOA could have sought to rebut that evidence, but it declined to do so.

The Supreme Court's decision in *Sandhill Acres*, which came after the Arbitrator's decision, only confirmed the propriety of his conclusion that the "directly related" requirement had been satisfied in this case. When the Arbitrator issued his decision, the lower court in *Sandhill Acres* had rendered its opinion in *Sandhill Acres Home Owners Association v. Sandhill Acres MHC, LLC*, 2018 WL 4613716 (Del. Super. Sept. 18, 2018).

The lower court held that, in order to satisfy the "directly related" requirement, the community owner had to offer evidence regarding its original costs, its original expected return, and how the expenditure in question altered the relationship between the two.[20] In other words, the lower court required that the community owner show that its overall costs were higher than before, *and* that its expected return had declined. Because the community owner had failed to do so, the lower court overturned the arbitrator's decision.

---

[20] 2018 WL 4613716, at *5.

On appeal, the Supreme Court reversed, holding that there was "no basis" in the Act for the Superior Court's requirement that the community owner show its original costs and original expected return and how the monies spent had affected them.[21] Rather, for a *prima facie* case at arbitration, the community owner need only show that it has incurred costs likely to reduce its expected return.[22] The homeowners then have an option to rebut this showing, but in *Sandhill Acres* they had not done so.[23]

Here, the HOA argues that Wild Meadows was required to show that its overall costs had increased by introducing information about what the previous owner's costs had been. According to the Supreme Court in *Sandhill Acres*, however, that is the homeowners' burden, not the community owner's.[24]

As the Supreme Court observed, the homeowners are free to request information during the pre-arbitration phase of the proceedings regarding the community owner's "costs and profit margins" in an attempt to satisfy their burden.[25] Absent that, however, the limited role of the Superior Court upon review is to determine whether the community owner has presented sufficient evidence to satisfy its "modest" burden.[26] Here, as in *Sandhill Acres*, the community owner did so.

---

[21] *Sandhill Acres*, 210 A.3d at 729.
[22] *See id.* ("To make a *prima facie* case that a rent increase is directly related to improving the community – a requirement that we have previously described as modest – it suffices for the community owner to offer evidence that in making some capital improvement, the community owner has incurred costs that are likely to reduce its expected return.") (internal quotations and citations omitted).
[23] *Id.*
[24] 210 A.3d at 729; *see also Rehoboth Bay Homeowners' Ass'n v. Hometown Rehoboth Bay, LLC*, 2020 WL 1316831, at *3 (Del. Super. Mar. 16, 2020) (Superior Court relied upon Supreme Court's decision in *Sandhill Acres* in rejecting homeowners' argument that community owner must provide evidence that increased costs resulted in lower returns or profits).
[25] *Sandhill Acres*, 210 A.3d at 731.
[26] *Id.* at 729, 732.

**2. Wild Meadows was not required to show that its expenditure was for "capital improvements."**

The Court also rejects the HOA's argument that expenditures must be associated with "capital improvements" in order to satisfy the "directly related" requirement of the Act.[27] This argument is based upon a misreading of the Supreme Court's opinion in *Sandhill Acres.* There, the Court stated,

> To make a *prima facie* case that a rent increase is directly related to improving the community – a requirement that we have previously described as "modest" – it suffices for the community owner to offer evidence that in making some capital improvement, the community owner has incurred costs that are likely to reduce its expected return.[28]

The Court was clearly **not** saying that, to satisfy the "directly related" provision, a community owner must show that expenditures were related to capital improvements. Such a requirement would run afoul of the statute itself, which designates as qualifying expenditures those for "operating, maintaining, **or** improving" the mobile home community.[29] Rather, the Court referred to capital improvements because that was the type of expenditure involved in *Sandhill Acres*, *i.e.*, the installation of a water filtration system. Therefore, the HOA's reading of *Sandhill Acres* is unwarranted.[30]

---

[27] HOA Reply Br. at 13.
[28] 210 A.3d at 729 (internal citation omitted).
[29] Former 25 *Del. C.* § 7042(a)(2) (emphasis supplied); *cf. Bon Ayre II*, 149 A.3d at 237 (it would be improper for Superior Court to "raise[] the threshold for evidence to prove" one of the statutory factors "without a basis in the text of the Act").
[30] *Accord Rehoboth Bay*, 2020 WL 1316831, at *3.

9

**3. The Arbitrator did not err by declining to find that Wild Meadows had violated an obligation of good faith and fair dealing.**

The HOA has also argued that the Arbitrator should have found against Wild Meadows on the "directly related" requirement because Wild Meadows violated its "obligation of good faith and fair dealing" in that it allegedly represented to the homeowners that the expenditures for the furniture and the computers would not result in a rent increase, and in that one of its representatives testified at Arbitration that Wild Meadows did not seek to recover the expenditures through the rent justification procedure. This Court, however, does not find that the Arbitrator erred in declining to reject Wild Meadows's evidence on the "directly related" requirement on this basis.

In viewing the record as a whole, with appropriate deference to the arbitrator,[31] the Court is not persuaded that Wild Meadows's representatives exhibited "bad faith" in their dealings with the homeowners or deliberately misled them, as the HOA alleges. Furthermore, this Court has previously held that "[n]owhere in the [Act] . . . is there a provision permitting the arbitrator to override a requested [rent] increase based on his or her decision regarding the unclean hands of one of the parties."[32] Thus, even if there were evidence of "unclean hands" or "bad faith" in the record – and as noted *supra,* there is not – it would have been inappropriate for the Arbitrator to base a decision upon that factor provided that the statutory requirements, as here, have been satisfied.

---

[31] *December Corp. II*, 2017 WL 923459, at *1.

[32] *December Corp. v. Wild Meadows Home Owners Ass'n*, 2016 WL 3866272, at *5 (Del. Super. July 12, 2016) ("*December Corp. I*").

10

**4. The proposed annual increase was not disproportionately larger than the expenditure.**

Finally, the Court turns to an issue not directly addressed by either party, though tangentially so by the HOA[33] – that is, whether the amount or level of Wild Meadows's expenditure in this case, *i.e.*, roughly $19,000, has any bearing upon whether Wild Meadows has satisfied the "directly related" requirement. In his decision, the Arbitrator openly wondered whether the Supreme Court, in its then-upcoming *Sandhill Acres* decision, would provide guidance on the issue of the extent to which "the *level* of the community owner's investment" may provide "another parameter to analyze" the "directly related" requirement of former Section 7042(a)(2).[34] In fact, the Supreme Court has now done so.

Specifically, the Supreme Court in *Sandhill Acres* held that if the proposed annual rent increase is disproportionately larger than the costs incurred – the Court used a 25 to 1 ratio as an example – the rent increase might not satisfy the "directly related" requirement of former Section 7042(a)(2).[35] According to the HOA, Wild Meadows is using its $19,042.23 expenditure to justify an annual rent increase of $107,040.00.[36] The HOA arrived at that rent increase figure by multiplying all 223 of the lots in the Community by the $40-per-lot proposed monthly rent increase[37] – a calculation that is arguably misleading, since 85 of the 223 homeowners had settled with Wild Meadows and accepted the proposed rent increase prior to arbitration.

---

[33] *See* HOA Opening Br. at 5-6, 26 n. 46 ("An expenditure of $19,042.33 yielding a rent increase of $107,040.00, a return of 5.5 times the expenditure each and every year without any new expenditure.").

[34] Arbitrator's decision at 18 (emphasis in original).

[35] *See Sandhill Acres* , 210 A.3d at 729-30 ("[I]f a community owner were to spend $ 1,000 on touching up aspects of the community, and then sought a much larger rent increase disproportionate to those costs (*e.g.*, $ 25,000 annually), an arbitrator would be justified in concluding that the proposed rent increase was not directly related to operating, maintaining, or improving the community.").

[36] HOA Opening Br. at 5 n. 10.

[37] $40 x 223 x 12(months) = $107,040.00.

Nevertheless, accepting a rent increase of $107,040.00 on the assumption that those who settled with the community owner did not have equal bargaining power with the community owner,[38] the resulting ratio would fall between 5 to 1 and 6 to 1 – a far cry from the 25 to 1 ratio referenced in *Sandhill Acres* as problematic. Therefore, the Court will not disturb the Arbitrator's decision on this basis.

**B. The Arbitrator's conclusion that the proposed rent increase was consistent with "market rent" pursuant to 25 *Del. C.* § 7042(c)(7) is likewise supported by substantial evidence and free from legal error.**

As noted *supra,* Wild Meadows is relying upon "market rent" as the third prong of its rent justification procedure. The former 25 Del.C. § 7042(c) states in relevant part as follows:

> *Market rent.*--For purposes of this section, "market rent" means that rent which would result from market forces absent an unequal bargaining position between the community owner and the home owners. In determining market rent relevant considerations include rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities. To be comparable, a manufactured home community must be within the competitive area and must offer similar facilities, services, amenities and management.[39]

**1. The Market Rent Study Report submitted by Wild Meadows did not improperly rely upon rents charged to purchasers of existing homes.**

The HOA argues that the Market Rent Study Report offered by Wild Meadows in support of its rent increase application (hereinafter the "Report") improperly relied upon rents charged to purchasers of manufactured homes already

---

[38] *See* Arbitrator's decision at 5 (assessing whether lot rental agreement addendum including names of 85 homeowners who settled with Wild Meadows prior to arbitration served as competent evidence of market rent given arguably unequal bargaining positions of homeowners and Wild Meadows).

[39] Former 25 *Del. C.* § 7042(c)(7).

12

situated on lots in manufactured home communities, rather than solely upon rents charged to prospective homeowners moving new manufactured homes onto vacant lots in those communities. According to the HOA, rents charged to purchasers of homes already present on lots do not reflect market rent because they do not mirror the rent "which would result from market forces absent an unequal bargaining position between the community owner and the home owners,"[40] since the community owner arguably could set a lot rent "above market," thus driving down the price of the existing home, *i.e.*, the current homeowner's "equity."[41] The HOA makes this argument, however, without any support either in the record evidence before the Arbitrator or in existing statutory or case law.

The HOA has failed to cite any testimony or other evidence in the arbitration record – including expert testimony – demonstrating the alleged three-way relationship between community owners, homeowners, and prospective purchasers of existing homes, or showing that such a relationship has acted to drive down prices of existing homes in manufactured home communities. Instead, the HOA asserts that "[a] real estate valuation expert is not needed to conclude that the lot rent and sale price of the home are interrelated and the effect of that interrelation on what 'market rent' is,"[42] perhaps seeking to obscure the fact that the HOA failed to support this novel theory with any expert testimony of its own. In fact, the **only** evidence before the Arbitrator on this point was the testimony of Wild Meadows's expert, Royce Ashton Rowles, who opined that the placement of a new home onto a vacant lot, as opposed to the purchase of an existing home, would have no impact upon his analysis of market rent.[43]

---

[40] *Id.*
[41] HOA Opening Br. at 31-32.
[42] *Id.* at 32.
[43] Arbitration Tr. at 197.

As indicated *supra*, the HOA can find no support for its theory in the underlying legal framework, either. The statutory definition of "market rent" refers to "new home owners entering the subject manufactured home community" without distinguishing between new homes on vacant lots and existing homes on occupied lots.[44] In *Bon Ayre II*, the Supreme Court recognized that this aspect of the statutory definition of market rent envisions "arms-length transactions" involving "new homeowners" who "have not yet made the investment in a specific home and are therefore unencumbered by switching and investment costs," but there is no mention in the Supreme Court's analysis of the HOA's claimed distinction between vacant lots and existing homes.[45]

Also persuasive is Wild Meadows's constitutional argument on this point. Limiting comparable lot rents for purposes of establishing "market rent" to those for vacant lots would hamstring community owners in their efforts to satisfy this element of the statutory scheme, and thereby hinder their constitutionally guaranteed property rights, because vacant lots are few and far between.[46] The Supreme Court faced essentially the same situation in *Bon Ayre II*, where the court below had required the community owner to prove lot rents in comparable manufactured home communities by presenting evidence of actual lot rents charged in such communities – which would have required the community owner to obtain access to the leases for the lots and present evidence of actual lease terms – rather than submitting other competent evidence of such rents. The Supreme Court noted that there would be no means, under the current arbitration procedures, for the community owner to obtain

---

[44] Former 25 *Del. C.* § 7042(c)(7).
[45] *Bon Ayre II*, 149 A.3d at 237-238; *see also id.* at 234 ("Community owners are able to set whatever initial rent the market can bear when they attract new tenants. Homeowners are free to accept the rate, or they can choose a different community.").
[46] With regard to the Community itself, Wild Meadows has represented to the Court, without contradiction from the HOA, that there are no vacant lots remaining. Wild Meadows Answering Br. at 32.

14

such evidence,[47] and therefore the imposition of this requirement, which is not found in the Act, would raise "constitutional due process concerns by subjecting community owners to restrictions on their property rights without a fair way to prove a relevant statutory factor that could ease the restriction."[48] As noted *supra*, the non-statutory restriction espoused by the HOA would similarly burden community owners by limiting them to a small subset of lot rents in their efforts to prove market rent and would, as in *Bon Ayre II*, represent a "judicially created evidentiary restriction . . . absent from the language of the Act."[49]

In short, were this Court to accept the HOA's arguments on this point, it would be adding a qualification to the definition of "market rent" that is simply not present in the language of the statute. Moreover, at oral argument, the HOA could point to no case authority supporting its contention regarding new and existing homes.

### 2. The Report and the testimony of its author did not constitute incompetent evidence.

The HOA argues that the Report, as well as the testimony of its author and Wild Meadows's expert, Mr. Rowles, constituted incompetent evidence because Mr. Rowles was not a licensed Delaware appraiser at the time he authored the study or at the time he testified. The Court disagrees.

First of all, the Court finds no error in the Arbitrator's conclusion that the Report was not "an appraisal that would require a Delaware license."[50] Secondly, and more to the point, even assuming *arguendo* that the Report is an "appraisal" as defined by Delaware law, this would not render it incompetent as evidence in these proceedings. The Supreme Court, as noted *supra*, confronted an analogous issue in

---

[47] As the Court noted, the Act's arbitration procedures do not provide for compulsory process to obtain evidence from third parties. *Bon Ayre II*, 149 A.3d at 237.
[48] *Id.*
[49] *Id.*
[50] Arbitrator's decision at 3.

15

*Bon Ayre II* in rejecting the concept that competent evidence of lot rents in comparable communities was confined to evidence of actual rents as reflected in lease terms. As the Court noted, competent evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[51]

Just as evidence of advertised rents was found by the Court in *Bon Ayre II* to have at least as much evidentiary value as evidence of rents actually charged,[52] so the Report and the testimony of its author possessed evidentiary value to the extent that they assisted the Arbitrator in understanding the issue of market rent, regardless of whether that author was licensed in Delaware.[53] Moreover, just as the Court in *Bon Ayre II* rejected a non-statutory evidentiary requirement that a community owner prove market rent only through evidence of actual rents charged, so this Court must reject the non-statutory requirement that a community owner present evidence of market rent only through analysis and testimony of a licensed Delaware appraiser. Here, like the Supreme Court in *Bon Ayre II*, this Court must disallow a "judicially created evidentiary restriction absent from the language of the Act."[54]

---

[51] *Bon Ayre II*, 149 A.3d at 237 (citing D.R.E. 401).

[52] *See id.* at 238 ("The rates that are advertised should be attractive to the consumers searching for a lot and therefore typical of the relevant market rate. . . . Thus, a requirement to prove actual rents would impose a great burden on bystanders without obvious benefit to the arbitration . . . .").

[53] Notably, the HOA did not contend at the arbitration that Mr. Rowles was not qualified to provide expert testimony at the hearing, but instead that the Report and Mr. Rowles's testimony regarding it were incompetent because he was not licensed as an appraiser in Delaware. *See* Arbitrator's decision at 3; Arbitration Tr. at 175-76. Indeed, the record establishes that Mr. Rowles was a commercial real estate appraiser at the time of the arbitration, although not licensed as an appraiser in Delaware. Arbitration Tr. at 175.

[54] *Bon Ayre II*, 149 A.3d at 237.

**3. The Arbitrator did not err by admitting into evidence leases that were not presented to the homeowners at the Final Meeting.**

At the arbitration, the Arbitrator admitted, as additional evidence of market rent, certain leases entered into with the homeowners by Wild Meadows in December 2017 and January and February 2018, subsequent to the Final Meeting, which took place in November 2017. The HOA contends that the Arbitrator erred in admitting these leases into evidence because they were not presented at the Final Meeting – noting the Act's requirement that, prior to the Final Meeting, the community owner must "disclose in writing all of the material factors resulting in the decision to increase the rent"[55] – and because the leases were identical to other leases, not offered into evidence by Wild Meadows, that were entered into with the homeowners shortly before Wild Meadows's purchase of the Community.

The HOA's arguments on this point are not persuasive. By its own terms, the statute requires disclosure of the "material factors" leading to the decision to increase the rent, not of all documents that may have been related to that decision. Wild Meadows did not contend, and the Arbitrator did not find, that the leases in question were themselves "material factors" upon which the decision to increase the rent was based – indeed, the leases actually offered into evidence by Wild Meadows could **not** have been so, given the fact that they were signed **after** the Final Meeting. Moreover, the leases were offered as additional evidence of market rent,[56] and there is no indication in the record that they were even related to the decision to increase the rent.

Here the Court again looks to Supreme Court precedent, and specifically the *Bon Ayre II* Court's holding that "in proving what market rent is, and in

---

[55] Former 25 *Del. C.* § 7043(b).
[56] The Arbitrator noted that had the leases been the **only** evidence of market rent, they would not have been admitted. Arbitrator's decision at 15-16.

17

demonstrating relevant considerations bearing on the issue, a community owner is able under the Act to introduce evidence relevant to that purpose . . . ."[57] The question here is not whether the leases were presented at the Final Meeting, but whether they were relevant to the issue of market rent. Nowhere does the HOA argue that they were not. Accordingly, the Court finds that the Arbitrator did not err in admitting them.

## V.    CONCLUSION

The Arbitrator's decision that Wild Meadows's proposed rent increase was valid because it satisfied the requirements of former 25 *Del. C*. § 7042 – *i.e.,* that the rent increase was "directly related to operating, maintaining, or improving the manufactured home community" and that the proposed rent increase was consistent with "market rent" – was supported by substantial evidence and free from legal error. Therefore, the decision of the Arbitrator is **AFFIRMED**.

**IT IS SO ORDERED.**

_/s/ Noel Eason Primos_
Judge

NEP/wjs
*Via File & ServeXpress*
oc:    Prothonotary
        Counsel of Record
        file

---

[57] 149 A.3d at 237.